UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Inner City Contracting LLC,

    Plaintiff,

v.                                                    Case No. 2:22-cv-11349

Charter Township of Northville, *et al.*,       Sean F. Cox
                                                        United States District Court Judge

    Defendants.
_____/

## OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION

Plaintiff, Inner City Contracting LLC ("ICC") initiated this action against Defendants, the Charter Township of Northville ("Northville") and Fleis & Vandenbrink Engineering, Inc. ("F&V") (collectively "Defendants") after not being selected as the successful bidder on a municipal project. (ECF No. 1). ICC alleges that Defendants violated their equal protection and due process rights, as well as several state-law tort claims. (ECF No. 1-1).

Currently before the Court is ICC's motion for a preliminary injunction, which was fully briefed in state court before the action was removed to this Court. (ECF No. 4-1). The Court held a status conference to discuss the motion on June 22, 2022. At the status conference, the parties requested that the Court use the state court briefing to decide ICC's motion for a preliminary injunction before this Court, and the Court concludes that oral argument is not necessary. Thus, the Court orders that the motion will be decided without a hearing. *See* E.D. Mich. LR 7.1(f).

For the reasons described below, the Court **DENIES** ICC's motion for a preliminary injunction.

1

## BACKGROUND

**Procedural History**

On May 31, 2022, ICC initiated this action in Wayne County Circuit Court against Defendants. (ECF No. 1-1). The Complaint alleges deprivation of equal protection brought pursuant to 42 U.S.C. § 1983 (Count I) and deprivation of due process rights brought pursuant to 42 U.S.C. § 1983 (Count II), libel and slander by F&V (Count III), and tortious interference by F&V with advantageous business expectancies. (ECF No. 1-1).

While the action was still pending in Wayne County Circuit Court, on June 9, 2022, ICC filed an ex parte motion for a temporary restraining order and the issuance of a preliminary injunction. (ECF No. 4-1). On June 10, 2022, the Wayne County Circuit Court denied Plaintiff's motion for a temporary restraining order and scheduled a hearing on the motion for preliminary injunction for June 17, 2022 at 11:45 a.m.

However, on the morning of June 17, 2022 – only a few hours before the hearing in Wayne County Circuit Court was to take place – Northville removed the action to this Court based on federal question jurisdiction pursuant to 28 U.S.C. § 1331. (ECF No. 1). Shortly thereafter, ICC's counsel informed the Court that the notice of removal did not attach the pending preliminary injunction and corresponding filings.

Under 28 U.S.C. § 1446, defendants are required to file "a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." As such, the Court contacted Northville's counsel asking them to include the required documents. However, ICC's counsel filed the documents before Northville's counsel did. (ECF No. 4). Northville's counsel filed an

Amended Notice of Removal with the required documents in the evening of June 17, 2022. (ECF No. 7).

**ICC's Allegations**

ICC's claims arise out of Northville's public bid request for "the demolition of the Northville Psychiatric Hospital Buildings C, H, J, 3 and 17, and alternates for Buildings L, M. N, O and 14 ("the Project")[.]" (ECF No. 1-1, at PageID 10). Northville retained a consultant, F&V, for the Project.

After seeing Northville's request for bids on BidNet, a public online bid service, ICC evaluated the Project, "put together its cost estimates, and submitted its bid with the Township for the Project." (ECF No. 1-1, at PageID 12). ICC alleges that it submitted the lowest bid for the Project, and Asbestos Abatement, Inc. ("AAI") submitted the second lowest bid, which was almost $1 million more than ICC's bid. (ECF No. 1-1, at PageID 12-13). Trevor Woollatt ("Woollatt"), a Senior Project Manager/Associate at F&V, interviewed ICC and AAI.

*The Interview*

ICC is a minority owned business, and it alleges that "Defendants' bias against ICC began from the initial contact as to this 'interview.' " (ECF No. 1-1, at PageID 13). ICC alleges that Woollatt sent an email to Curtis Johnson ("Johnson") that stated:

Hi there,

Trevor Woollatt is inviting you to a scheduled Zoom meeting.

Topic: Chevy Commons Catch-up
Time: This is a recurring meeting Meet anytime.

(ECF No. 1-1, at PageID 13). Johnson believed that the email had been sent to him in error because it referred to "Chevy Commons Catch-up" and ICC did not bid on that project. (ECF No. 1-1, at

3

PageID 13). The email also did not include a date or time for the meeting. (ECF No. 1-1, at PageID 13).

ICC alleges that "[l]ess than an hour before the interview on April 28, 2022, Woollatt advised ICC that the meeting invitation was in fact for the Northville Psychiatric Hospital Project. ICC was thus given less than an hour to prepare for the interview and gather the members of its team who should be present for the interview." (ECF No. 1-1, at PageID 14).

As part of F&V's recommendation to Northville, F&V provided a "Construction Bidder Evaluation Checklist" for each bidder, which was prepared by Woollatt. (ECF No. 1-1, at PageID 14). In AAI's Construction Bidder Evaluation Checklist, Woollatt noted that he thought it was an important factor in AAI's favor that it asked for the interview questions in advance. (ECF No. 1, at PageID 14). ICC alleges that "Woollatt made it impossible for ICC to ask for the interview questions in advance by not giving ICC notice of the interview in advance and providing ICC less than an hour to prepare for the interview." (ECF No. 1-1, at PageID 14). ICC alleges that this "demonstrated the bias and animus of defendants as to ICC, as they are replete with misrepresentations and false information." (ECF No. 1-1, at PageID 15).

***Misrepresentations in Construction Bidder Evaluation Checklists***

ICC further alleges that Woollatt and F&V provided Northville with false information in the Construction Bidder Evaluation Checklists for ICC and AAI when F&V recommended that the Board of Trustees award the contract for the Project to AAI. (ECF No. 1-1, at PageID 16). ICC identifies eight specific misrepresentations.

First, ICC alleges that Woollatt misrepresented whether ICC and AAI had MIOSHA violations within the last three years prior to bid opening. (ECF No. 1-1, at PageID 15). Woollatt

4

represented that ICC had MIOSHA violations and AAI did not. (ECF No. 1-1, at PageID 15). ICC states that this was untrue, and that AAI "had been cited by EGLE three times in 2021 alone for improper asbestos removal on three different properties. (ECF No. 1-1, at PageID 15). ICC states that "EGLE records show that ICC never received a violation in any of those years, contrary to Woolatt's misrepresentation on the Construction Bidder Evaluation Checklist as to ICC[.]" (ECF No. 1-1, at PageID 16). Based upon this, ICC asserts "[h]ad Woollatt and F&V truthfully reported to the Township Board of Trustees, they would have been compelled to say that ICC had no violations, while AAI and its subcontractors had violations." (ECF No. 1-1, at PageID 17).

Second, ICC alleges that Woollatt misrepresented whether ICC and AAI used the bonding capacity of any other entity. (ECF No. 1-1, at PageID 17). Woollatt represented that ICC and AAI both used the bonding capacity of other entities. (ECF No. 1-1, at PageID 18). However, ICC alleges that it "had sufficient bonding capacity on its own to complete the Project." (ECF No. 1-1, at PageID 18). Based upon this, ICC asserts "[h]ad Woollatt and F&V truthfully reported to the Township Board of Trustees when F&V recommended that the Board of Trustees, they would have been compelled to say that ICC had the bonding capacity on its own to perform the Project, while AAI did not have the bonding capacity on its own." (ECF No. 1-1, at PageID 18).

Third, ICC alleges that Woollatt misrepresented whether ICC had completed projects of similar size and complexity. (ECF No. 1-1, at PageID 19). Woollatt represented that ICC had not previously completed projects of similar size and complexity. (ECF No. 1-1, at PageID 19). ICC asserts that "[a]s ICC made clear to Woollatt and F&V, ICC has completed projects of similar size and complexity, including demolition of the Cadillac Stamping plant." (ECF No. 1-1, at PageID 19). ICC directs the court to State of Michigan notifications to highlight the differences in the

volume of work between ICC and AAI. (ECF No. 1-1, at PageID 19). ICC alleges that Woollatt falsely stated that ICC's subcontractor, City Abatement, had many EGLE citations. (ECF No. 1-1, at PageID 19). ICC also asserts that "Woollatt also did not record on the Construction Bidder Evaluation Checklist nor advise the Township Board of Trustees that the principal of City Abatement is a Certified Hazardous Materials Manager, the highest classification for the industry that can be achieved." (ECF No. 1-1, at PageID 20). Based on this, ICC alleges that '[h]ad Woollatt and F&V truthfully reported to the Township Board of Trustees, they would have been compelled to say that ICC and City Abatement had performed substantially more projects of similar size and complexity than had AAI." (ECF No. 1-1, at PageID 20).

Fourth, AAI is on the Federal System for Award Management exclusion list, and ICC alleges that Woollatt and F&V failed to advise the Township Board of Trustees that "this was a major red flag, which should have been sufficient to disqualify AAI as a bidder." (ECF No. 1-1, at PageID 21).

Fifth, ICC alleges that "Woollatt misrepresented AAI's size and equipment." (ECF No. 1-1, at PageID 21). ICC further asserts that their "facility and equipment are substantially greater than that of AAI." (ECF No. 1-1, at PageID 22).

Sixth, ICC alleges that Woollatt made false statements "about how ICC conducts its business and its timeline." (ECF No. 1-1, at PageID 23). ICC asserts "[c]ontrary to Woollatt's false representations, at no time during the interview did ICC ever say that ICC was good with leaving some 'meat on the bone' or that ICC was good at 'back door stuff.' " (ECF No. 1-1, at PageID 22). ICC alleges that Woollatt failed to report ICC's means and methods, crew sizes, and equipment in the Notes section. (ECF No. 1-1, at PageID 22). ICC further asserts that:

6

> While Woollatt wanted to claim in his 'Notes' that ICC's timeline – which was quicker than that of AAI – was not reasonable given the project, that is untrue. Because ICC knows what it is doing, it knows how long it would take to demolish each building, and ICC can do it better than AAI because it has the equipment and personnel to do the project, unlike AAI.

(ECF No. 1-1, at PageID 23).

Seventh, ICC alleges that Woollatt made false representations as to whether ICC had provided security for the Project. (ECF No. 1-1, at PageID 24). ICC states "[r]eview of ICC's bid shows that it included approximately $100,000 for site security." (ECF No. 1-1, at PageID 23). ICC further asserts that AAI did not provide security. (ECF No. 1-1, at PageID 24). Based upon this, ICC alleges "[h]ad Woollatt and F&V truthfully reported to the Township Board of Trustees, they would have been compelled to say that ICC's bid had provided for security while that of AAI did not, unless they agreed to 'add money' for security during the interview." (ECF No. 1-1, at PageID 24).

Eighth, ICC alleges that Woollatt made false representations as to whether ICC had provided information as to working hours, daily reporting and tracking project metrics. (ECF No. 1-1, at PageID 25). ICC asserts that it provided this information and Woollatt was untruthful by representing to the Township Board of Trustees by representing that ICC had not provided the information. (ECF No. 1-1, at PageID 25).

Based upon these eight misrepresentations, ICC alleges that "by treating ICC differently than similarly-situated entities to ICC's detriment," Defendants have violated ICC's right to equal protection of the law and have deprived ICC of its rights to procedural and substantive due process. (ECF No. 1-1, at PageID 25-26).

7

## ANALYSIS

Under FED. R. CIV. P. 65(a), a district court may issue a preliminary injunction only on notice to the adverse party. As established above, Defendants have notice of the motion, as evidenced by their counsel's appearance on the record in this matter, their briefing in response to this motion, and their appearance at the June 22, 2022 status conference regarding this matter.

### I. Standing

As an initial matter, Northville argues that as a disappointed bidder, ICC does not have standing to challenge the bidding process by F&V. (ECF No. 4-4, at PageID 185). Northville bases its argument on the "longstanding rule" in Michigan that "a disappointed low bidder on a public contract has no standing to sue in order to challenge the award of a contract to another bidder." *Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs, Architects & Planners Inc.*, 492 Mich. 40, 46, 821 N.W.2d 1, 3 (2012) (holding that a "plaintiff as the lowest bidder on a public contract had no valid business expectancy").

ICC argues that it has standing under an exception to this rule for "fraud, abuse, or illegality." (ECF No. 4-5, at PageID 389). However, the Michigan Court of Appeals has stated that this exception only applies to actions brought by public officials:

> The only circumstance that may provide a basis for an action to review the bidding process is the presence of evidence of 'fraud, abuse, or illegality.' *But such an action must be brought by the proper public official.* Opening the floodgates of litigation to every disappointed bidder that believes it has been aggrieved by the bidding process would serve the interests of neither the government nor the citizen-taxpayers that the bidding process is designed to advance.

*Groves v. Dept. of Corrections*, 295 Mich. App. 1, 811 N.W.2d 563, 568 (2011) (emphasis added). There is no question that ICC is a private entity and is not "the proper public official" that could bring an action in Michigan courts to review the bidding process.

As this motion and the subsequent briefs were filed in state court, the parties do not address whether ICC has standing in federal court. However, the Court need not address whether ICC has federal standing for this motion for a preliminary injunction because ICC has not met its burden of proving that the circumstances demand such an extraordinary remedy.

## II. Criteria for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Cnty. Gov't,* 305 F.3d 566, 573 (6th Cir. 2002). The following four factors are considered in determining whether to grant a preliminary injunction: (1) the likelihood that the party seeking the injunction will prevail on the merits; (2) the danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued; (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief; and (4) the public interest. *Id*. "A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Id*. No single factor is determinative. *Id*.

### 1. Whether ICC Is Likely To Prevail On The Merits

"[I]n seeking a preliminary injunction, a federal plaintiff has the burden of establishing the likelihood of success on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 546 n. 2 (6th Cir. 2007). In demonstrating the likelihood of success, "it is

ordinarily sufficient if the [movant] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics*, 119 F.3d at 402. (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

> ICC argument that it will prevail on the merits is in-full as follows:
>
> ICC submits that the allegations and documentary evident submitted above demonstrates that ICC will prevail on the merits. ICC was the lowest bidder by almost a million dollars, the most qualified bidder, and but for the false statements and biased opinion of the Township's consultant and the constitutional violations of the Township, it would have been awarded this contract.

(ECF No. 4-1, at PageID 116).

Northville argues that ICC has failed to demonstrate a likelihood of prevailing on the merits for three reasons.

First, Northville argues that ICC "alleges no facts suggesting a plausible theory of liability against the Township. Rather, the allegations in its Complaint pertain to F&V." (ECF No. 4-4, at PageID 189).

Second, Northville argues that ICC has not met the heavy burden needed to prevail on a class-of-one equal protection theory. (ECF No. 4-4, at PageID 189).

"Equal protection challenges are typically concerned with governmental classifications that affect some groups of citizens differently than others." *U.S. v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (citing *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008). "However, the Supreme Court has recognized that a "class-of-one" may bring an equal protection claim where the plaintiff alleges that (1) he or "she has been intentionally treated differently from others similarly situated";

and (2) "there is no rational basis for the difference in treatment." *Id*. (citing *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Specifically, Northville argues that ICC cannot meet the second element – that there was no rational basis for the difference in treatment. (ECF No. 4-4, at PageID 189).

"There are two ways that a 'class-of-one' plaintiff may demonstrate that a government action lacks a rational basis: (1) showing pure arbitrariness by negativing every conceivable basis that might support the government's decision; or (2) showing an illegitimate motive such as animus or ill will." *Green*, 654 F.3d at 652. Here, ICC has alleged that there was an illegitimate motive – animus towards a minority owned company. (*See* ECF No. 1-1).

Third, Northville argues that ICC has not identified a protected fundamental right or liberty or property interest needed to prevail on its due process claims. (ECF No. 4-4, at PageID 190). The Sixth Circuit has explained the framework for analyzing due process claims as follows:

> Procedural and substantive due process claims are examined under a two-part analysis. First, the Court must determine whether the interest at stake is a protected liberty or property interest under the Fourteenth Amendment. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Only after identifying such a right do we continue to consider whether the deprivation of that interest contravened the notions of due process. *Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548; *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); *Ferencz v. Hairston,* 119 F.3d 1244, 1247 (6th Cir.1997); *Tony L. v. Childers,* 71 F.3d 1182 (6th Cir.1995).

*Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001). Northville argues that ICC "failed to allege a protected property interest or liberty interest, let alone any facts suggesting that the Township deprived it of a protected interest." (ECF No. 4-4, at PageID 190). ICC does not substantively address this argument in its reply brief (ECF No. 7-7, at PageID 819). Rather, ICC states "ICC believes that the evidence submitted as exhibits to the complaint demonstrates that it

11

can prevail on its equal protection or due process claims, as well as its libel and slander claims and its tortious interference claims." (ECF No. 7-7, at PageID 821). This is insufficient to meet ICC's burden "of establishing the likelihood of success on the merits." *Tenke*, 511 F.3d at 546 n. 2.

In sum, it is unclear at this time if ICC will prevail on the merits on some or all of its claims. However, the burden is on ICC to demonstrate that it would prevail on the merits, and ICC has not met this burden. Therefore, this factor does not favor a preliminary injunction.

**2. Whether ICC Will Be Irreparably Harmed If An Injunction Is Not Issued**

"Regarding the second element of the *Overstreet* framework—irreparable harm—the law is settled that a party moving for a preliminary injunction must establish more than mere monetary injury." *Contech Casting, LLC v. ZF Steering Systems, LLC*, 931 F.Supp2d 809, 817 (E.D. Mich. Mar. 13, 2013) (citing *Sampson v. Murray,* 415 U.S. 61, 90 (1974)). However, "[a]t the same time, courts have recognized that the irreparable harm element of the preliminary injunction framework may be satisfied on a showing that, absent an injunction, financial hardship would be so severe that it would cause the moving entity to be "completely wiped out," thereby rendering "a later judgment on the merits meaningless." *Contech Casting*, 931 F.Supp.2d at 817 (citing *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 924 (6th Cir.1978)).

The moving party must also show that irreparable harm is "both certain and immediate, rather than speculative or theoretical." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir.1991). Additionally, and "of critical importance, the irreparable harm requirement contemplates the inadequacy of alternate remedies available to the plaintiff. Thus, irreparable harm will not be found where alternatives already available to the

plaintiff make an injunction unnecessary." *Contech Casting*, 931 F.Supp.2d at 818 (internal citations removed).

ICC argument that it will suffer irreparable harm is in-full as follows:

> ICC submits that it will suffer irreparabl[e] damage to its reputation and good will by the false statements made by the Township's consultant. By falsely stating that ICC has been citing for violations, is unprofessional, cannot handle projects of this size, or cannot obtain the necessary bonding for projects as the one that is the subject of this litigation, ICC's ability to bid on work from other governmental agencies has been damages, which will be irreparable if a TRO does not issue.

(ECF No. 4-1, at PageID 116).

Defendants argue that ICC's allegations as to their irreparable harm are "conclusory and impermissibly vague and generalized." (ECF No. 4-4, at PageID 188). Defendants also argue that the alleged harm – the bidding process – "is a past, rather than an ongoing process." (ECF No. 4-4, at PageID 188).

Significantly, ICC has failed to demonstrate how damage to its reputation is more than a monetary injury. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. "The key word in this consideration is irreparable. Mere injuries, however, substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Sampson,* 415 U.S. at 90. However, "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Tenke*, 511 F.3d at 550. Courts in this District have repeatedly held that "mere loss of profits, or relative deterioration of competitive position, do not in themselves suffice." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. E.F. Hutton & Co., Inc.*, 403 F. Supp. 336, 343 (E.D. Mich. 1975); *see also Nexstep Systems, Inc. v. OTG Management, Inc.*, No. 10-14473, 2011 WL 3918871, at *14 (E.D. Mich. Sept. 7, 2011).

Here, ICC has not argued that it cannot be fully compensated by monetary damages. Moreover, ICC's "mere loss of profits, or relative deterioration of competitive position" is not sufficient to establish an irreparable injury as a basis for preliminary injunctive relief. *See Merrill Lynch*, 403 F. Supp. at 343.

Therefore, this factor does not favor a preliminary injunction.

### 3. Whether ICC Will Be Harmed More By The Absence Of An Injunction Than Northville Would Be By Granting Relief

ICC argues that "there is no harm to the Township if a TRO issues. Instead the opposite is true. The Township will benefit by having the more qualified contractor with a proven record of demolishing buildings containing asbestos do the work, and will save the Township almost a million dollars as well." (ECF No. 4-1, at PageID 117). ICC notes that the Northville Psychiatric Hospital has been sitting vacant since 2003 and a few more months will not cause Northville any harm. (ECF No. 4-1, at PageID 117).

Northville argues that it will suffer harm if an injunction is granted. Specifically, Northville argues: "[d]elay will increase costs for Township taxpayers. For example, labor and material costs will only rise during a stay of construction, particularly given the present historically high inflation. Delay also creates risk and uncertainty for the contracting parties." (ECF No. 4-4, at PageID 190). Northville also notes that ICC's alleged injury "is, in reality, simply losing a bid." (ECF No. 4-4, at PageID 191).

This factor does not favor a preliminary injunction.

### 4. Whether Granting The Injunction Is In The Public Interest

ICC argues that "the public interest will be harmed if the TRO does not issue, as AAI and Trust Thermal Abatement, Inc. have both been cited by EGLE for asbestos violations on relatively

14

small projects. The risk to the public of asbestos contamination on a project the size of the former Northville Psychiatric Hospital is too great to allow the demolition process to proceed." (ECF No. 4-1, at PageID 116).

Northville argues that the public interest would be served by completing the demolition of the Northville Psychiatric Hospital as quickly as possible. (ECF No. 4-4, at PageID 190). Northville plans to build a new park, Legacy Park, on the land once the demolition is complete. Northville argues that the "increased costs, risks, and delay would needlessly place Legacy Park further out of reach for Township taxpayers, whose quality of lift will be enhanced by the park." (ECF No. 4-4, at PageID 191).

The Court is not in a position to determine whether AAI's work on the Project would constitute a public health risk because of AAI's alleged past EGLE citations. ICC has not supported this assertion, nor has it described the risk to the public with any specificity. Furthermore, it is "the duty of public officials to consider honestly competitive bids[.]" *Malan Const. Corp. v. Board of County Road Com'rs of Wayne County*, 187 F. Supp. 937, 939 (E.D. Mich. 1960). Before Northville made its decision to award the contract to AAI, ICC sent Northville correspondence "demonstrating the fraudulent and untrue statements in the report of F&V." (ECF No. 4-5, at PageID 391). This correspondence specifically noted AAI's past EGLE citations. (ECF No. 4-5, at PageID 401). However, Northville still chose to award the contract to AAI. (ECF No. 4-5, at PageID 391). At this stage of the litigation, the Court is not going to second-guess Northville's decision based on ICC's vague allegation of harm to public safety.

It would seem that the public interest will be harmed by the continued delay of the demolition of the abandoned, asbestos-contaminated buildings and the construction of a new public park. Therefore, this factor does not favor a preliminary injunction.

## CONCLUSION

For the reasons stated above, ICC's motion for a preliminary injunction is **DENIED** because the *Overstreet* factors do not favor such an extraordinary remedy in this action.

**IT IS SO ORDERED.**

                                                    s/Sean F. Cox
                                                    Sean F. Cox
                                                    United States District Judge

Dated: June 30, 2022