## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**INNER CITY CONTRACTING, LLC,**

                **Plaintiff,**

**v.**

**THE CHARTER TOWNSHIP OF NORTHVILLE, MICHIGAN, a Michigan municipal corporation, and FLEIS & VANDENBRINK ENGINEERING, INC., a Michigan corporation doing business as FLEIS & VANDENBRINK, jointly and severally,**

                **Defendants.**

**Case No. 2:22-cv-11349-SFC-DRG**

**HONORABLE SEAN F. COX, DISTRICT COURT JUDGE**

**HONORABLE DAVID R. GRAND, MAGISTRATE JUDGE**

## <u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

Plaintiff, Inner City Contracting, LLC, by and through its counsel, states for its first amended complaint against defendants the Charter Township of Northville, Michigan and Fleis & Vandenbrink Engineering, Inc., doing business as Fleis & Vandenbrink, jointly and severally, as follows:

## THE PARTIES

1.      Plaintiff Inner City Contracting, LLC ("ICC") is a limited liability company, with its registered office is located in Wayne County, Michigan.

2.      Defendant the Charter Township of Northville, Michigan ("the Township") is a Michigan municipal corporation, located in Wayne County, Michigan.

3.      Defendant Fleis & Vandenbrink Engineering, Inc., doing business as Fleis & Vandenbrink ("F&V"), is a Michigan corporation, with its registered office located in Kent County, Michigan.

## JURISDICTION AND VENUE

4       In its claims, ICC seeks damages from defendants in excess of $25,000.00.

5.      ICC filed suit in Wayne County Circuit Court, as the actions of which plaintiff complains occurred in Wayne County, Michigan, and the Township removed the case to this Court.

## FACTUAL ALLEGATIONS

6.      On March 21, 2022, the Township advertised a public bid request for the demolition of the Northville Psychiatric Hospital

Buildings C, H, J, 3 and 17, and alternates for Buildings L, M, N, O and 14 ("the Project").

7.     The advertisement for bids stated that the Project involves the demolition of asbestos-containing materials, underground utilities and other related work.

8.     The advertisement for bids stated that the bids from potential contractors would be publicly opened and read when they were received.

9.     The Township issued a Project Manual for this Project.  In Section 18.05 *Evaluation of Bids*, it states at Section A, "In evaluating Bids, Owner will consider whether the Bids comply with the prescribed requirements, and such alternates, unit prices, and other data, as may be requested in the Bid Form or prior to the Notice of Award" (a copy of the relevant portion of the Project Manual is attached hereto as Exhibit 1).

10.     The Township retained a consultant, defendant F & V, for the Project.

11.     F & V assigned responsibility for its work on the Project to Trevor Woollatt, Senior Project Manager/Associate, whose actions and statements were made on behalf of F & V and the Township.

- 3 -

12.    ICC is a 51% minority owned LLC, formed in April 2009.  The company focuses on heavy civil contracting, including demolition, site work, utilities installation, site remediation, and trucking.  It has grown over the years to approximately 55 employees, and possesses the training, experience, and background to handle some of the largest projects in the area with the requirements for blight elimination and site redevelopment.

13.    ICC is a certified minority-owned enterprise.

14.    ICC is a member of BidNet, a public on-line bid service for local and State, which the Township utilized to post its request for bids on the Project.

15.    The Township posted its request for the solicitation posted, and ICC attended the mandatory Pre-Bid meeting.

16.    Representatives of ICC as well as two of its prospective asbestos subcontractors walked the site in order to gain a complete understanding of the scope of the Project.

17.    Each building identified in the Request for Proposals was independently estimated for size, composition of construction, amount of debris, fill, and asbestos abatement.

18.    ICC put together its cost estimates and submitted its bid to the Township for the Project.

19.    ICC submitted the low bid for the Project (a copy of the chart showing the amounts bid by each contractor who submitted a bid for the Project is attached hereto as Exhibit 2).

20.    The second lowest bid was submitted by Asbestos Abatement, Inc ("AAI") (Exhibit 2).

21.    The difference in the amount of the two bids was substantial.  ICC's total bid for the base project plus alternates was $7,563,015.  AAI's total bid for the base project plus alternates was $8,520,400, almost $1 million more than ICC's bid (Exhibit 2).

22.    ICC was not only the lowest bidder, but the most qualified bidder for the Project.

23.    Despite the almost one million dollar difference in the bids submitted by ICC and AAI, defendants decided to have to Trevor Woollatt, Senior Project Manager/Associate, "interview" the two lowest bidders - ICC and AAI.

24.    Defendants' bias against ICC began from the initial contact as to this "interview."

25.     On April 27, 2022, at 11:19 a.m., Woollatt sent email correspondence to Curtis Johnson which stated:

Hi there,

Trevor Woollatt is inviting you to a scheduled Zoom meeting.

Topic:     Chevy Commons Catch-up
Time: This is a recurring meeting  Meet anytime

(a copy of the email correspondence from Trevor Woollatt to Curtis Johnson, April 27, 2022, is attached hereto as Exhibit 3).

26.     There was nothing in this email correspondence from Woollatt that indicated that he would be interviewing ICC for the Project the next day, or on any day.

27.     When Johnson received this email correspondence from Woollatt (Exhibit 3), he believed it had been sent to him in error, as it referred to "Chevy Commons Catch-up," which was not a project on which ICC had bid.  It also had no date or time for the meeting.

28.     Woollatt then sent email correspondence to Curtis Johnson, president of ICC, on April 27, 2022, which requested a "brief interview" and asked if he would be "available tomorrow for a call" (a copy of the email correspondence from Trevor Woollatt to Curtis Johnson, April 27, 2022, is attached hereto as Exhibit 4).  ICC

did not learn until April 28, 2022 that this was to be more than a "brief interview" by telephone call.

29.    To its credit, ICC rose to the occasion.  Johnson was present at ICC's location for the interview, not in his car as Woollatt falsely asserted.

30.    Woollatt prepared a "Construction Bidder Evaluation Checklist" as to ICC and as to AAI (a copy of the Construction Bidder Evaluation Checklist as to ICC is attached hereto as Exhibit 5; a copy of the Construction Bidder Evaluation Checklist as to AAI is attached hereto as Exhibit 6).

31.    Woollatt and F & V provided these completed Construction Bidder Evaluation Checklists as to ICC and AAI to the Board of Trustees of the Township as part of F & V's recommendation as to the contractor to whom the contract for the Project should be awarded (a copy of the information provided to the Board of Trustees for the May 12, 2022 Township Board meeting is attached hereto as Exhibit 7).

32.    In the "Notes" section of Construction Bidder Evaluation Checklist as to AAI, Woollatt thought it was an important factor in

AAI's favor that it asked for the interview questions in advance (Exhibit 6).

33.    Yet Woollatt made it impossible for ICC to ask for the interview questions in advance by not giving ICC adequate notice of the interview in sufficient time for ICC to adequately prepare for the interview.

34.    Review of the Construction Bidder Evaluation Checklists as to ICC and AAI demonstrates the bias and animus of defendants as to ICC, as they are replete with misrepresentations and false information, negatively as to ICC and positively as to AAI.

35.    On the Construction Bidder Evaluation Checklists, one of the questions was, "Does this contractor have MIOSHA violations within the last three (3) years prior to bid opening (http://www.osha.gov/pls/imis/establishment.html)".

36.    Woollatt answered "yes" for ICC (Exhibit 5) and "no" for AAI (Exhibit 6).

37.    Woollatt's responses were untrue.

38.    As the records maintained by the State of Michigan Department of Environment, Great Lakes and Energy ("EGLE") demonstrate, AAI had been cited by EGLE three times in 2021 alone

for improper asbestos removal on three different properties.  The

EGLE Air Quality Division Source Asbestos/Drycleaning Violations

List Sorted by Contractor shows the citations (a copy of the EGLE Air

Quality Division Source Asbestos/Drycleaning Violations List Sorted

by Contractor is attached hereto as Exhibit 8).

39.    The citations by EGLE show that AAI "performed the

asbestos abatement activities at the sites."  The citation dated May 7,

2021 was issued because that AAI failed "to remove all RACM during

abatement activities" and failed "to thoroughly inspect for asbestos" (a

copy of this citation, dated May 7, 2021, is attached hereto as Exhibit

9). The citation dated May 11, 2021 was also issued because that

AAI failed "to remove all RACM [Regulated Asbestos-Containing

Material] during abatement activities" and failed "to thoroughly inspect

for asbestos" (a copy of this citation, dated May 11, 2021, is attached

hereto as Exhibit 10).

40.    Review of these citations show that the properties for

which AAI was cited were just residential properties, which are

substantially less difficult to control for asbestos issues than the multi-

building project of demolishing the Northville Psychiatric Hospital

Buildings, which was the basis of the Project.

41.    Woollatt was untruthful as to AAI's violations when he completed the Construction Bidder Evaluation Checklist as to AAI.

42.    Woollatt and F & V provided this false information to the Township Board of Trustees when F & V recommended that the Board of Trustees award the contract for the Project to AAI (Exhibit 7).

43.    Review of the EGLE Air Quality Division Source Asbestos/ Drycleaning Violations List Sorted by Contractor (Exhibit 8) also shows that ICC is *not* on the list, contrary to the representation made by the Woollatt on the Construction Bidder Evaluation Checklist as to ICC that ICC had violations.

44.    The EGLE Air Quality Division Source Asbestos/ Drycleaning Violations List Sorted by Contractor (Exhibit 8) is a public record that defendants could easily obtain and can be accessed as far back as 2016.

45.    The EGLE records show that ICC never received a violation in any of those years, contrary to Woollatt's misrepresentation on the Construction Bidder Evaluation Checklist as to ICC (Exhibit 5; Exhibit 8).

46. The EGLE Air Quality Division Source Asbestos/ Drycleaning Violations List Sorted by Contractor also shows that the companies with which AAI is planning to work also have numerous asbestos violations (Exhibit 8), contrary to Woollatt's assertions on the Construction Bidder Evaluation Checklist as to AAI (Exhibit 6).

47. Woollatt was untruthful when he stated that ICC had violations when he completed the Construction Bidder Evaluation Checklist as to AAI.

48. Woollatt and F & V provided this false information to the Township Board of Trustees when F & V recommended that the Board of Trustees award the contract for the Project to AAI (Exhibit 7).

49. Had Woollatt and F & V truthfully reported to the Township Board of Trustees, they would have been compelled to say that ICC had no violations, while AAI and its subcontractors had violations.

50. Instead, Woollatt and F & V reported falsely to the Township Board of Trustees that ICC had violations and AAI and its subcontractors did not have violations.

51.     There was no legitimate reason for Woollatt and F & V to provide false information as to violations to the Township Board of Trustees.

52.     On the Construction Bidder Evaluation Checklist, one of the questions which were to be completed for each company was, ""Are you using the bonding capacity of any other entity (i.e, subcontractor)?"

53.     Woollatt answered "yes" for ICC (Exhibit 5) and "yes" for AAI (Exhibit 6).

54.     Woolatt's response as to ICC was untrue.

55.     ICC had sufficient bonding capacity on its own to complete the Project. ICC did not need to use the bonding capacity of any subcontractor. ICC did not state anywhere in its bid that it needed to use the bonding capacity of a subcontractor, nor was this raised in the interview.

56.     However, as the Construction Bidder Evaluation Checklist states as to AAI, that company did not have sufficient bonding capacity on its own to perform the Project. It had to rely on the bonding capacity of a subcontractor. Importantly, the identity of the

company on whom AAI had to rely to obtain bonding capacity was never disclosed.

57.　Woollatt was untruthful when he stated that ICC did not have sufficient bonding capacity on its own to perform the Project.

58.　Woollatt and F & V provided this false information to the Township Board of Trustees when F & V recommended that the Board of Trustees award the contract for the Project to AAI (Exhibit 7).

59.　Had Woollatt and F & V truthfully reported to the Township Board of Trustees, they would have been compelled to say that ICC had the bonding capacity on its own to perform the Project, while AAI did not have the bonding capacity on its own.

60.　Instead, Woollatt and F & V reported falsely to the Township Board of Trustees that both companies needed to rely on the bonding capacity of subcontractors.

61.　On the Construction Bidder Evaluation Checklist, one of the questions which to be completed for each company was, "Are the completed projects of similar size and complexity, and references, acceptable?"

62.    As to this question, Woollatt answered "no" for ICC (Exhibit 5) and "yes" for AAI (Exhibit 6).

63.    Woollatt's responses as to ICC and AAI were untrue.

64.    As ICC made clear to Woollatt and F & V in its bid documents and supplemental documents, ICC has completed projects of similar size and complexity, including demolition of the Cadillac Stamping plant and substantial work for the largest industrial developer in the country, NorthPoint Development.

65.    It is a legal requirement in the State of Michigan that a contractor file a 10-day Demolition Notification with the Michigan EGLE-Air Quality Asbestos Program for all demolition work, residential and commercial, performed within the state.

66.    Each Demolition Notification requires the name of the demolition contractor performing the work; the location of the work; the work dates and hours for the project; the identification of an asbestos survey being performed; whether or not asbestos was abated from the structure; and the identity of the landfill to which the demolition debris was being transported.

67.    Review of the Demolition Notifications on file with the State of Michigan at

https://www.egle.state.mi.us/asbestos_notifications/Pages/AbSearch.aspx show the vast differences between the volume of work performed by ICC and by AAI.

68.     AAI has approximately 271 Demolition Notifications on file with the State of Michigan and its limited wrecking notifications are for houses.

69.     ICC has 4,800 Demolition Notifications on file with the State of Michigan, almost 20 times the amount that AAI has.

70.     ICC's subcontractor, City Abatement, has 6,837 Demolition Notifications on file with the State of Michigan, almost 30 times the amount AAI has.  City Abatement has performed approximately $750,000 of work in the last two months as the notifications list shows, while AAI has done less than $10,000 in the same time period.

71.     Unlike AAI, City Abatement is not listed as having asbestos violations on the EGLE Air Quality Division Source Asbestos/Drycleaning Violations List Sorted By Contractor (Exhibit 8).

72.     Yet Woollatt falsely stated that City Abatement had "many citations."

73.     Woollatt also did not record on the Construction Bidder Evaluation Checklist nor advise the Township Board of Trustees that the principal of City Abatement is a Certified Hazardous Materials Manager, the highest classification for the industry that can be achieved.

74.     There is no factual basis for the assertion that AAI has a track record of demolition work with large commercial properties.

75.     While Woollatt states that AAI had references for larger demolition contracts, there are no Demolition Notifications on file with the State of Michigan which supports this assertion.

76.     Importantly, two of the companies listed as AAI's references for AAI's demolition work do not have Demolition Notifications for the work that AAI allegedly performed.  AAI did not file any Demolition Notification for the Mt. Pleasant State Psychiatric Hospital demolition.  The only Demolition Notification for that project was filed by a different company, Melching, Inc.  Likewise, there are no Demolition Notifications for the Sappi Paper Mill demolition in the name of AAI.  The only Demolition Notification for that project was filed by Melching, Inc., which is unrelated to AAI.

77.    The state regulations do not allow a company/contractor to work under a different company's/contractor's Demolition Notification.

78.    As for the third reference, the Michigan State Capitol Building, the Demolition Notification filed by AAI showed that it abated very small quantities of asbestos (300 linear feet to 800 square feet of asbestos, about the size of a small office).

79.    Woollatt was untruthful when he stated that ICC had not completed projects of similar size and complexity to the Project.

80.    There is no factual basis for the assertion that ICC only demolishes small residential properties.

81.    Woollatt never even tried to contact anyone at Cadillac Stamping or at NorthPoint to obtain recommendations as to ICC's work.

82.    Woollatt and F & V provided this false information to the Township Board of Trustees when F & V recommended that the Board of Trustees award the contract for the Project to AAI (Exhibit 7).

83.    Had Woollatt and F & V truthfully reported to the Township Board of Trustees, they would have been compelled to say

that ICC and City Abatement had performed substantially more projects of similar size and complexity to the Project than had AAI.

84.     Instead, Woollatt and F & V reported falsely to the Township Board of Trustees that ICC had not performed projects of similar size and complexity as the Project.

85.     There was no legitimate reason for Woollatt and F & V to provide false information to the Township Board of Trustees as to whether or ICC had performed projects of similar size and complexity as the Project.

86.     On the Construction Bidder Evaluation Checklist, one of the questions which to be completed for each company was, "Is the company or are principal individuals on the Federal System for Award Management [SAM] (http://www.SAM.gov) exclusion list?"

87.     Woollatt answered "yes" for AAI (Exhibit 6).

88.     ICC is not on the federal system for award management [SAM] exclusion list (Exhibit 5).

89.     Woollatt and F & V did not advise the Township Board of Trustees that this was a major red flag, which should have been sufficient to disqualify AAI as a bidder.

90.    As the federal government's SAM procurement page

states, "An exclusion record identifies parties excluded from receiving

Federal contracts, certain subcontracts, and certain types of Federal

financial and non Financial assistance and benefits. Exclusions are

also referred to as suspensions and debarments."

91.    If the federal government has suspended or debarred AAI

from receiving federal contracts and subcontracts, that should serve

as a warning to any unit of government that there are problems with

this company.

92.    Woollatt and F & V did not bring to the attention of

Township Board of Trustees that AAI was on the federal government

SAM exclusion list when F & V recommended that the Board of

Trustees award the contract for the Project to AAI (Exhibit 7).

93.    There was no legitimate reason for Woollatt and F & V not

to bring to the attention of Township Board of Trustees that AAI was

on the federal government SAM exclusion list.

94.    Review of the Construction Bidder Evaluation Checklist

shows that Woollatt misrepresented AAI's size and equipment.  AAI's

facility consists of a house and a metal pole barn (photographs

showing AAI's facility is attached hereto as Exhibit 11).  AAI's

property is one acre in size. AAI has one piece of equipment, an excavator (an aerial view of AAI's facility is attached hereto as Exhibit 12).

95. ICC's facility and equipment are substantially greater than that of AAI. ICC's two facilities are 4.5 acres and 14.5 acres in size. ICC owns or has on long-term lease more than 100 pieces of heavy equipment.

96. The "Notes" section of the Construction Bidder Evaluation Checklist further demonstrates defendants' bias and animus against ICC.

97. Contrary to Woollatt's false representations, at no time during the interview did ICC ever say that ICC was good with leaving some "meat on the bone" or that ICC was good at "back door stuff."

98. ICC's history of the massive number of projects it has done with no violations shows that the company is very good at following the rules.

99. During the interview with Woollatt, ICC emphasized its means and methods in detail, with crew sizes for abatement and demolition, and described what equipment ICC would use at the

jobsite.  Woollatt failed to report any of this information in the "Notes" section (Exhibit 5).

100.  ICC made it clear during the interview that it would perform the work one building at a time, but this statement does not show up in the "Notes" as to ICC (Exhibit 5); it only shows up under the "Notes" for AAI (Exhibit 6).

101.  While Woollatt wanted to claim in his "Notes" that ICC's timeline - which was quicker than that of AAI - was not reasonable given the project, that is untrue.  Because ICC knows what it is doing, it knows how long it would take to demolish each building, and ICC can do it better than AAI because it has the equipment and personnel to do the project, unlike AAI.

102.  ICC took a very deliberate and conservative approach about when it would finish the original project, which did not include the alternates.  When Woollatt said that the contract would include the alternates as well, ICC offered immediately to provide an updated schedule that day.  Woollatt advised ICC that this would not be necessary, but then falsely represented that this information was not forthcoming.

103. ICC's schedule showed that it would complete the demolition sooner than the date projected by AAI.

104. Woollatt was untruthful when he made false statements about how ICC conducts its business and its timeline.

105. Woollatt and F & V provided this false information to the Township Board of Trustees when F & V recommended that the Board of Trustees award the contract for the Project to AAI (Exhibit 7).

106. There was no legitimate reason for Woollatt and F & V to provide false information as to how ICC conducts its business and its timeline.

107. Woollatt was untruthful in the "Notes" section of the Construction Bidder Evaluation Checklist as to ICC when he stated that ICC did not discuss security (Exhibit 5).

108. Review of ICC's bid shows that it included approximately $100,000 for site security.

109. As Woollatt's "Notes" on the Construction Bidder Evaluation Checklist as to AAI reflect, AAI apparently did not provide for site security in its bid, because Woollatt states that AAI "added money for 24 hour security at the site" (Exhibit 6).

110.   Woollatt was untruthful when he made false representations that ICC had not provided for adequate security for the Project while AAI had done so.

111.   Woollatt and F & V provided false information about ICC - casting it in an unwarranted negative light - and AAI - casting it in an unwarranted positive light - to the Township Board of Trustees when F & V recommended that the Board of Trustees award the contract for the Project to AAI (Exhibit 7).

112.   Had Woollatt and F & V truthfully reported to the Township Board of Trustees, they would have been compelled to say that ICC's bid had provided for security while that of AAI did not, unless they agreed to "add money" for security during the interview.

113.   Instead, Woollatt and F & V reported falsely to the Township Board of Trustees that ICC's bid had not provided for security for the Project.

114.   There was no legitimate reason for Woollatt and F & V to provide false information as to ICC's bid to the Township Board of Trustees.

115.   Woollatt was untruthful in the "Notes" section of the Construction Bidder Evaluation Checklist as to whether ICC provided

information as to working hours, daily reporting and tracking project metrics (Exhibit 5).

116.  ICC did provide information as to working hours, daily reporting and tracking project metrics, which it does for the voluminous number of projects it has performed.

117.  Woollatt was untruthful when he made false representations as to whether ICC had provided information as to working hours, daily reporting and tracking project metrics.

118.  Woollatt and F & V provided this false information to the Township Board of Trustees when F & V recommended that the Board of Trustees award the contract for the Project to AAI (Exhibit 7).

119.  Had Woollatt and F & V truthfully reported to the Township Board of Trustees, they would have been compelled to say that ICC had provided information as to working hours, daily reporting and tracking project metrics.

120.  Instead, Woollatt and F & V reported falsely to the Township Board of Trustees that ICC had not provided information as to working hours, daily reporting and tracking project metrics.

121. There was no legitimate reason for Woollatt and F & V to provide false information as to ICC's bid to the Township Board of Trustees.

122. The statements of F & V and Woollatt were fraudulent.

123. By the actions and statements of defendants, there was fraud in the bidding process.

124. By their actions and statements and failure to investigate, defendants committed a violation of trust.

125. Based on the actions and statements of and failure to investigate by defendants, action by this Court is necessary to prevent an injustice.

126. In awarding the contract to AAI, the Township Board did no investigation into whether the award to AAI was in the best interest of the Township.

127. Because of the false and untruthful statements made by F & V and Woollatt, representatives of ICC requested before and at the Township Board meeting at which the contract was awarded to AAI that the Township Board make a determination as to the veracity of F & V's report, but the Township declined to take any action or even discuss the basis for awarding the contract to AAI.

128.   The Township did not consider the cost, schedule or qualifications of ICC and AAI.

129.   The actions of which ICC complains as to the Township were taken by the Board of Trustees, who are officials with final decision-making authority.

130.   The actions of which ICC complains as to the Township which were taken by the Board of Trustees were the moving force behind the violation of ICC's constitutional rights.

131.   The Township engaged in inadequate supervision of F & V and Woollatt, which was the moving force behind the violation of ICC's constitutional rights.

132.   As the Township's agent, the actions and statements of F & V and Woollatt can be fairly attributed to the Township.

133.   As a minority-owned entity, ICC is a member of a suspect class.

134.   The actions of defendants of which ICC complains were motivated by considerations based on race.

135.   Defendants' actions and statements in falsely making negative statements about ICC and falsely making unwarranted

positive statements about AAI were motivated by ICC's membership in a suspect class.

136. Defendants acted with unlawful and intentional discriminatory animus.

137. Defendants acted with malice against ICC.

138. By treating ICC differently than AAI, which is a white-owned company and which is similarly-situated to ICC, defendants have violated ICC's right to equal protection of the law, as guaranteed under the Fourteenth Amendment of the United States Constitution.

139. ICC has fundamental property and liberty rights of which it cannot be deprived without procedural and substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

140. Defendants' unwarranted actions against ICC are arbitrary and capricious.

141. Defendants, by their actions and statements, have deprived ICC of its rights to procedural and substantive due process, as guaranteed under the Fourteenth Amendment of the United States Constitution.

142. Defendants' actions toward ICC are harassing.

143. Defendants' actions have caused ICC to suffer injury and economic loss, among other damages.

144. As the false and fraudulent information provided by F & V were published by all defendants to third parties through the Township's website, F & V's actions have damaged ICC's goodwill and reputation.

145. The Township's adoption of the falsely negative information about ICC which it published to third parties through its website and at the Board meetings and its arbitrary and capricious actions damaged ICC's reputation and goodwill.

146. The damage to ICC's reputation caused by defendants' wrongful actions and statements, which has been made public, will have an impact on ICC's ability to bid future projects.

147. Because of the nature of the injuries which the defendants have inflicted and will continue to inflict on ICC, ICC may not have a complete remedy at law and therefore seeks injunctive relief from this Honorable Court.

148. The policy to unlawfully harass ICC and engage in unlawful activity denying ICC its fundamental rights has injured ICC in its business and property.

149.  Defendants' harassing activities are municipal actions and are inherently arbitrary and a deliberate misuse of governmental power.

## COUNT I

### Deprivation of Rights to Equal Protection of the Law
### Brought Pursuant To 42 U.S.C. § 1983

150.  The allegations set forth in paragraphs 1 through 149 are incorporated herein by reference.

151.  Defendants, through their actions, have deprived and continue to deprive ICC of federally protected rights, privileges and immunities provided by federal law and the United States Constitution, and ICC is thereby entitled to damages for defendants' deprivation of ICC's constitutional rights to equal protection of the laws, for which ICC can bring a claim through the mechanism of 42 U.S.C. §1983.

152.  Defendants' actions as set forth in the preceding paragraphs deprived ICC of its constitutionally-protected right to equal protection of the law under the Fourteenth Amendment of the United States Constitution.

153.  ICC was selectively treated in adverse ways by defendants, as set forth in the preceding paragraphs.

154.  ICC was treated adversely and differently than AAI, who was similarly situated to ICC, and ICC is a member of a suspect class.

155.  The policies and actions of defendants were based on considerations other than those proper to the good-faith administration of justice and lay far outside the scope of legitimate action.

156.  As a direct and proximate result of defendants' actions, ICC has have suffered and continues to suffer injury, including irreparable harm.

157.  Because of the nature of defendants' actions, which had the effect of destroying the business opportunities of ICC, ICC does not have a complete and adequate remedy at law, and injunctive relief is required.

158.  Because of defendants' deprivation of ICC's rights to equal protection of the law, and because defendants' actions show reckless disregard and callous indifference for ICC's federally protected rights, ICC is entitled to all compensatory and other damages incurred, including costs and attorney fees pursuant to 42 U.S.C. §1988.

WHEREFORE, ICC respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for Relief below and enter a judgment in its favor and against defendants for ICC's damages, plus costs, interest and attorney fees.

## COUNT II

### Deprivation of Due Process Rights
### Brought Pursuant To 42 U.S.C. § 1983

159.  The allegations set forth in paragraphs 1 through 158 are incorporated herein by reference.

160.  Defendants, through their actions, have deprived and continue to deprive ICC of federally protected rights, privileges and immunities provided by federal law and the United States Constitution, including ICC's liberty interests, and ICC is thereby entitled to damages for defendants' deprivation of ICC's constitutional rights to due process, for which ICC can bring a claim through the mechanism of 42 U.S.C. §1983.

161.  The policies and actions of defendants were and are based on considerations other than those proper to the good-faith administration of justice and lay far outside the scope of legitimate action.

162.  Defendants' actions constituted a deliberate deprivation and denial, under color of law, of ICC's federal rights as guaranteed under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, for which ICC is entitled to bring a claim through the mechanism of 42 U.S.C. §1983.

163.  Defendants' actions in depriving ICC of its due process rights were based wrongfully on ICC being a member of a suspect class.

164.  As a direct and proximate result of defendants' actions, ICC has suffered and continues to suffer injury, including irreparable harm.

165.  Because of the nature of defendants' actions, which had the effect of destroying the business opportunities of ICC, ICC does not have a complete and adequate remedy at law, and injunctive relief is required.

166.  Because defendants acted with an improper motive and intent, in an arbitrary and discriminatory manner, and their actions show reckless disregard and callous indifference for ICC's federally protected rights, ICC is entitled to all compensatory and other

damages incurred, including costs and attorney fees pursuant to 42 U.S.C. §1988.

WHEREFORE, ICC respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for Relief below and enter a judgment in its favor and against defendants for ICC's damages, plus costs, interest and attorney fees.

## COUNT III

### Deprivation of Equal Rights
### Brought Pursuant To 42 U.S.C. § 1981

167.  The allegations set forth in paragraphs 1 through 166 are incorporated herein by reference.

168.  Defendants, through their actions, have deprived and continue to deprive ICC of the federally protected rights set forth in 42 U.S.C. §1981.

169.  Defendants intended to discriminate against ICC based on its race.

170.  Defendants' actions abridged a right of ICC enumerated in 42 U.S.C. §1981.

171.  As a direct and proximate result of defendants' actions, ICC has suffered and continues to suffer injury, including irreparable harm.

172.  Because of the nature of defendants' actions, which had the effect of destroying the business opportunities of ICC, ICC does not have a complete and adequate remedy at law, and injunctive relief is required.

173.  Because defendants acted in violation of 42 U.S.C. §1981, ICC is entitled to all compensatory and other damages incurred, including costs and attorney fees pursuant to 42 U.S.C. §1988.

WHEREFORE, ICC respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for Relief below and enter a judgment in its favor and against defendants for ICC's damages, plus costs, interest and attorney fees.

## COUNT IV

### Claim Under Act 170 Of 1933
### Bidders of Public Works
### M.C.L. 123.501 *et seq.*

174.  The allegations set forth in paragraphs 1 through 173 are incorporated herein by reference.

175.  Act 170 of 1933, M.C.L. 123.501 *et seq.*, governs bidding on municipal contracts for construction of public works.

176.  The Project as set forth in the preceding paragraphs involved a contract awarded by the Township for a public works project.

177.  M.C.L. 123.506 provides:

> Any person feeling himself aggrieved at the determination of any such officer, board, commission, committee or department shall have the right of appeal by mandamus, certiorari or other proper remedy to the supreme court of the state of Michigan, or in any proper case to any circuit court having jurisdiction.

178.  ICC is aggrieved at the determination of the Township Board to award the contract for the Project to AAI.

179.  ICC is a "person" as defined by M.C.L. 123.508.

180.  The Township Board did not comply with M.C.L. 123.501 *et seq.* in awarding the contract for the Project to AAI.

181.  The Township acted improperly and wrongfully in awarding the contract for the Project to AAI.

182.  Because of the Township's actions, ICC has been and continues to suffer injury and damages, including loss of reputation and goodwill.

WHEREFORE, ICC respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for

Relief below and enter a judgment in its favor and against defendants for ICC's damages, plus costs, interest and attorney fees.

## COUNT V

### Libel and Slander of ICC by F & V

183. The allegations set forth in paragraphs 1 through 182 are incorporated herein by reference.

184. F & V made false statements orally and in writing to third parties about ICC, as set forth in the preceding paragraphs.

185. F & V knew that the false statements which it made about ICC were untrue at the time they statements were made.

186. F & V made the false statements specifically to hold ICC and its operations up to public scorn, ridicule and embarrassment in its business operations, to otherwise wrongfully disparage ICC's business operations, and to deter third parties from doing business with ICC.

187. F & V knowingly, willfully and without privilege to do so did publish the false and defamatory statements set forth in the preceding paragraphs of this Complaint about ICC to third parties.

188. F & V was both knowingly and negligently at fault in the publication of these false and defamatory statements about ICC

189.  F & V was grossly negligent in the making and the publication of these false and defamatory statements about ICC.

190.  F & V's oral and written false and defamatory statements concerning ICC and its business constitute actionable libel and slander per se

191.  F & V's oral and written false and defamatory statements have caused ICC to suffer injury, including but not limited to, interfering with its relationships with their customers and potential customers and members of the media and the public.

WHEREFORE, ICC respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for Relief below and enter a judgment in its favor and against defendants for ICC's damages, plus costs, interest and attorney fees.

## COUNT VI

### Tortious Interference by F & V with
### Advantageous Business Expectancies

192.  The allegations set forth in paragraphs 1 through 191 are incorporated herein by reference.

193.  As the lowest bidder on the Project, ICC had a legitimate business expectancy of being awarded the contract for the Project by the Township.

194.   As a successful contractor, ICC has legitimate business expectancies of being selected as the successful bidder on municipal and other projects.

195.   F & V had knowledge of these business expectancies.

196.   By its actions and by statements made to the Township and other third parties, which were false, misleading and fraudulently made, F & V intentionally and improperly interfered with, or caused a breach or disruption of ICC's business expectancy with the Township and ICC's business expectancies with other third parties.

197.   F & V knew that it made false and misleading negative statements as to ICC so that the Township would not award the contract for the Project to ICC.

198.   F & V knew that it made false and misleading positive statements as to AAI so that the Township would award the contract for the Project to AAI.

199.   F & V acted with improper motives which were unethical and/or fraudulent.

200.   As a direct and proximate result of F & V's tortious conduct, actions and statements, ICC has suffered and will continue to suffer injury.

201.  As a direct and proximate result of F & V's tortious conduct, action by this Honorable Court is required to prevent fraud, injustice and a violation of trust.

WHEREFORE, ICC respectfully requests that this Honorable Court enter an order granting the relief requested in the Request for Relief below and enter a judgment in its favor and against defendants for ICC's damages, plus costs, interest and attorney fees.

## **REQUEST FOR RELIEF**

Plaintiff Inner City Contracting, LLC respectfully requests that this Honorable Court enter a judgment for actual, compensatory, incidental and consequential damages on all of plaintiff's claims in an amount to be determined by a jury and entered by this Honorable Court, plus costs, interest, exemplary damages, and attorney fees, and that this Honorable Court also enter an order that:

A.     Preliminary and permanently enjoins the Charter Township of Northville and its agents, successors, representatives, assigners or any or person or entity acting for or on its behalf, including Fleis & Vandenbrink, from denying plaintiff equal protection of the laws and from violating plaintiff's rights to procedural and substantive due process under the Fourteenth Amendment of the

United States Constitution, or from violation plaintiff's rights under 42 U.S.C. §1981;

B.      Preliminary and permanently enjoins the Charter Township of Northville and its agents, successors, representatives, assigns or any other person or entity acting for or on its behalf, including Fleis & Vandenbrink from conspiring to violate plaintiff's constitutionally-protected rights;

C.      Enters judgment in favor of plaintiff on its claims under M.C.L. 123.501 *et seq.*;

D.      Enters judgment in favor of plaintiff on its claims against Fleis & Vandenbrink of libel and slander and tortious interference with advantageous business expectancies;

E.      Awards plaintiff, pursuant to 42 U.S.C. §1988, its costs, attorney fees, interest, lost profits, and all other damages as against defendants;

F.      Award plaintiff damages on all of its claims against defendants;

G.      Awards plaintiff both pre-judgment and post judgment interest on each and every damage award; and

H.     Awards any other and further relief to plaintiff as this

Honorable Court deems just and proper.


                              Respectfully submitted,


                              /s/ Cindy Rhodes Victor
                              CINDY RHODES VICTOR (P33613)
                              Kus Ryan PLLC
                              2851 High Meadow Circle, Suite 120
                              Auburn Hills, Michigan  48326
                              (248) 364-3090
                              cvictor@kusryan.com

Dated:  August 17, 2022       Attorneys for Plaintiff
                              Inner City Contracting, LLC


## RENEWED DEMAND FOR JURY

Plaintiff Inner City Contracting, LLC, by and through its counsel,

hereby demands a trial by jury on its causes of actions against

defendants the Charter Township of Northville, Michigan and Fleis &

Vandenbrink Engineering, Inc., doing business as Fleis &

Vandenbrink, jointly and severally.

Respectfully submitted,


/s/ Cindy Rhodes Victor
CINDY RHODES VICTOR (P33613)
Kus Ryan PLLC
2851 High Meadow Circle, Suite 120
Auburn Hills, Michigan  48326
(248) 364-3090
cvictor@kusryan.com

Dated:  August 17, 2022            Attorneys for Plaintiff
                                   Inner City Contracting, LLC